UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 11-80178-CR-HURLEY/HOPKINS

UNITED STATES OF AMERICA

vs.

CHRISTOPHER EUGENE NICHOLS,

    Defendant.
_____/

FILED by _____ D.C.

OCT 3 0 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## PLEA AGREEMENT

  The United States Attorney's Office for the Southern District of Florida ("this Office") and Christopher Eugene Nichols (hereinafter referred to as the "defendant") enter into the following agreement:

  1. The defendant agrees to plead guilty to count 1 of the superseding indictment, which count charge the defendant with bank robbery in violation of Title 18, United States Code, Sections 2113(a) and 2.

  2. The defendant agrees to plead guilty to count 3 of the superseding indictment, which count charges the defendant with attempted bank robbery in violation of Title 18, United States Code, Sections 2113(a) and 2.

  3. The defendant agrees to plead guilty to count 4 of the superseding indictment, which count charges the defendant with carrying a firearm during a crime of violence in violation of Title 18, United States Code, Sections 924(c)(1)(A).

  4. The defendant agrees to plead guilty to count 5 of the superseding indictment, which count charges the defendant with possession of a firearm and ammunition by a convicted felon in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e).

5. This Office agrees to seek dismissal of count 2 of the indictment, if the defendant is determined to be an Armed Career Criminal pursuant to Title 18, United States Code, Section 922(g)(1) and 924(e), or if defendant is sentenced to 240 moths or more in prison.

6. The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to 25 years on Count 1, followed by a term of supervised release of up to 5 years and a $250,000 fine. On Count 3, the Court may impose a statutory maximum term of imprisonment of up to 20 years, followed by a term of supervised release of up to 5 years, and a $250,000 fine. On Count 4, the Court must impose a 5 year minimum mandatory term of imprisonment consecutive to any sentence in Counts 1 and 3, a $250,000 and up to 3 years supervised release. On Count 5, the Court must impose a 15 year minimum mandatory up to life in prison, a $250,000 fine and up to 3 years supervised release.

7. The defendant further understand and acknowledges that, in addition to any sentence imposed under paragraph 6 of this agreement, a special assessment in the amount of $400.00 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If a defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

8. The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty

2

plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 6 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

This Office and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed: That the defendant be incarcerated for no less then 240 months.

The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to

enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The United States, however, will not be required to make this motion and this recommendation these recommendations if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

The defendant agrees that he shall cooperate fully with this Office by: (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other Court proceeding; (b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by this Office; and © if requested by this Office, working in an undercover role under the supervision of, and in compliance with, law enforcement officers and agents. In addition, the defendant agrees that he will not protect any person or entity through false information or omission, that he will not

4

falsely implicate any person or entity, and that he that he will not commit any further crimes.

This office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the cooperation, or lack thereof, known to the Court at the time of sentencing. If in the sole and unreviewable judgment of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the advisory sentencing range calculated under the Sentencing Guidelines and/or any applicable minimum mandatory sentence, this Office may make a motion prior to sentencing pursuant to Section 5K1.1 of the Sentencing Guidelines and /or Title 18, United States Code, Section 3553(e), or subsequent to sentencing pursuant to Rule 35 of the Federal Rules of Criminal Procedure, informing the Court that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced. The defendant understands and agrees, however, that nothing in this agreement requires the Office to file any such motions, and that this Office's assessment of the quality and significance of the defendant's cooperation shall be binding as it relates to the appropriateness of this Office's filing or non-filing of a motion to reduce sentence.

The defendant understands and acknowledges that the Court is under no obligation to grant a motion for reduction of sentence filed by the government. In addition, the defendant further understands and acknowledges that the Court is under no obligation of any type to reduce the defendant's sentence because of the defendant's cooperation.

### FACTUAL PROFFER

On August 12, 2011, at approximately 9:05 a.m., an individual entered TD Bank, 1601 West Boynton Beach Boulevard, Boynton Beach, Florida. He approached the teller counter and passed a note to the bank teller. The note stated "I have a gun. Give me your money now. You

have 30 seconds. Don't be a hero." The individual received bank money including an explosive dye pack. The individual was observed through surveillance video entering the driver's side of a silver Volkswagen Beetle with a sunroof. The individual was described as a white male with a large scar on his right cheek. He was wearing a dark colored baseball cap, tan short sleeve polo style shirt and eyeglasses. The TD Bank's accounts were determined to be insured by the Federal Deposit Insurance Corporation (FDIC).

On September 6, 2011, at approximately 10:02 a.m., an individual entered TD Bank, 969 SE 5 Avenue, Delray Beach, Florida. He approached the teller counter and passed a demand note to the bank teller. The note stated, "I have a gun. Give me the money, no dye pack, you have 30 seconds. Don't be a hero." The individual received the bank money. He exited the bank and was observed by a witness entering the passenger side of a silver Chrysler 300 type hatchback vehicle. The individual was described as a white male with a large scar on his right cheek. He was wearing a dark blue baseball cap with a picture of a Bass on the front, tan or white short sleeve button down shirt and eyeglasses. The TD Bank's accounts were determined to be insured by the FDIC.

On September 14, 2011, at approximately 9:17 a.m., an individual entered BB&T Bank, 2000 PGA Boulevard, Palm Beach Gardens, Florida. He approached a bank employee at her desk and displayed a demand note. He instructed the employee to take him to the vault room. He forced two employees to the vault room. When they were unable to open the vault the individual directed the employees to the Teller area. He took money from the teller drawer. The individual was described as a white male with a large scar on his right cheek. He was wearing a dark suit, light blue button down shirt, gray Fedora, eyeglasses and what appears to be an electric earpiece. The money was placed in a black bag. He had a black semi-automatic handgun in his

6

waistband. The individual was observed fleeing the area in a white Chevrolet work van.

Days after the August 12, 2011 TD bank robbery, an employee of a local Volkswagen dealership viewed the surveillance photographs of the silver Volkswagen Beetle. Based on the body type and rims of the vehicle it was believed to be a 1999, 2000 or 2001 Volkswagen Beetle, either a model GLS or GLX. All GLS and GLX models come standard with a sunroof.

On September 7, 2011, a Boynton Beach Code Enforcement Officer (CEO) found a dark blue baseball cap with a picture of a Bass on the front. The cap was in the swale near the southern entrance of the Heaterlake Subdivision in Boynton Beach, Florida. The CEO took the cap and gave it to a friend. Later, while searching the internet the CEO read the story of the Delray Bank robbery and observed that the hat the suspect was wearing at the time of the robbery resembled the one he had found. He notified the Boynton Beach Police department. The CEO, who lives in the Heatherlake Subdivision, was asked if he knew of any resident in his neighborhood who owned a silver Volkswagen Beetle. The CEO stated there was one at 63 Heather Cove Drive.

During a surveillance of 63 Heather Cove Drive a silver 2008 Dodge Magnum Station Wagon bearing Florida license AQYD91 was observed in the driveway of the residence. This vehicle is similar to a Chrysler 300 Station Wagon. The vehicle is registered to Christopher Eugene Nichols.

The Heather Cove Drive address was queried in a public database for current and previous residents. Damon James Davison among others was discovered. Davison was discovered to own a silver 2001 Volkswagen Beetle GLX.

On September 14, 2011, the CEO notified law enforcement officers that a white Chevrolet work van bearing Florida license W392IH was parked at the Heather Cove address.

The vehicle is registered to Lombart Instrument Company. Surveillance was conducted on the van and the driver appeared to be Davison.

The video surveillance from the Parker Bridge on U.S. 1 in North Palm Beach, Florida prior to the BB&T bank robbery shows a large white Chevrolet work van driving north over the bridge. There is a silver Dodge Magnum Station Wagon just in front of the van. The van can be seen crossing the bridge traveling south a short time after the bank robbery. The van has its daytime running lights on. The Parker Bridge is approximately ¼ mile south of the bank and is the most logical route traveling south. The Magnum in the video has the same type of rims as the ones on Nichol's vehicle. The van in the surveillance video of the bank and Parker Bridge look the same as the one Davison drives. There are three windows on the right side of the van, two on the back and one on the left side. Davison's van also has daytime running lights.

On the morning of September 29, 2011, Nichols was observed traveling from his residence to the Atlantic Square Shopping Plaza at the southeast corner of West Atlantic Boulevard and Jog Road in Delray Beach, Florida. The plaza contains two banks, an RBC Bank, 15086 South Jog Road, Delray Beach, Florida and Third Federal Bank, 15140 Jog Road, Delray Beach, Florida. Nichols arrived at the Plaza at approximately 8:48 a.m. He made several passes around Third Federal Bank and RBC Bank. He left the area at approximately 8:54 a.m., and returned home.

On the morning of October 3, 2011, Nichols was observed traveling from his residence to the shopping plaza at the southeast corner of West Atlantic Boulevard and Jog Road in Delray Beach, Florida. He continued west on West Atlantic Boulevard past the Atlantic Square Shopping Plaza approximately two miles. He entered a gas station and turned around. He went back east on West Atlantic Boulevard and turned south on Jog Road. Nichols continued a few

miles, made a U turn and headed back north on Jog Road. While Nichols was traveling north, Davison's white van was observed entering the shopping plaza on the southeast corner of West Atlantic and Jog Road. He made a pass by the bank and parked in the Home Depot parking lot. He was seen talking on his cellular telephone. Nichols continued north on Jog Road past West Atlantic Boulevard. He eventually turned around and entered the shopping plaza. At one point, Nichols had his hand to his ear as if talking on a cellular telephone. The white van arrived at the south side of Third Federal Bank. Nichols drove to where the van was parked. Nichols got in the front passenger seat of the van. Both Nichols and Davison were wearing baseball caps. They exited the plaza and approached RBC Bank where they were arrested without incident. Davison was driving and Nichols was in the front passenger's seat. Nichols had a loaded Glock model 27, semi-automatic handgun in his waist. He had a cellular telephone in his pants pocket with an electronic earpiece extended from the phone to his ear. Davison was also in possession of a cellular telephone. The RBC Bank's deposits are insured by the Federal Deposit Insurance Corporation (FDIC).

During a post Miranda interview Davison stated he and Nichols robbed the BB&T Bank on PGA in September 2011. Davison stated he met Nichols approximately 300 yards south of the bank. Nichols was wearing a dark suit and a hat. Davison drove Nichols to the front of the bank. After the robbery Davison dropped Nichols at his car and the two went separate ways. Nichols stated he and Davison planned to rob the RBC Bank the day of their arrest. Nichols informed Davison the week before that he had a bank picked. Davison drove to the Atlantic Square Shopping Plaza but did not see Nichols. He called Nichols and spoke to him. Davison met Nichols in the plaza near a trash dumpster. Nichols entered Davison's van. Nichols told Davison to drive on Jog Road which he did. They reentered the plaza and

9

approached the bank. As he drove near the bank they were arrested.

Davison viewed surveillance photos of the white van and silver Magnum from the Parker Bridge video. He positively identified the Magnum as Nichols' vehicle, and the van as his work van. Davison viewed a photograph of the Bass baseball cap found by the CEO in Boynton Beach. Davison positively identified it as Nichols'.

Finally, when Nichols was arrested, he spit out what agents at the time thought was chewing gum. After all the vehicles were searched, no demand note was found, which seemed unusual. The day following Nichols arrest, agents returned to the RBC bank parking lot and found exactly where Nichols had been handcuffed a balled up piece of paper, still damp which was a demand note.

## SENTENCING APPEAL WAIVER

The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b) and Title 28, United States Code, Section 1291. However, if the United States appeals the defendant's sentence pursuant to Sections 3742(b) and 1291, the defendant shall be released from the above waiver of appellate rights. By signing this

agreement, the defendant acknowledges that the defendant has discussed the appeal waiver set forth in this agreement with the defendant's attorney.

9. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

10. This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations, or understandings.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 10/30/12    By: _____
ROBERT H. WATERS, JR.
ASSISTANT UNITED STATES ATTORNEY

Date: 10/30/12    By: _____
RICHARD FRANCIS DELLA FERA
ATTORNEY FOR DEFENDANT

Date: 10/30/12    By: _____
CHRISTOPHER EUGENE NICHOLS
DEFENDANT